May it please the Court. Allison Jones, Counsel for the Plaintiff, Appellant, Brandon Holloway. Your Honors, this is a case that demonstrates the problematic application of the McDonnell Douglas v. Green Burden Shifting Framework for purposes of summary judgment analysis. This is a case where even if that burden shifting framework were properly utilized, the district court erred when it determined that Appellant Holloway did not provide substantial evidence to show pretext such that a reasonable juror could conclude that discrimination or retaliation occurred. The district court's granting of summary judgment should be reversed because the record shows factual inconsistencies upon which a reasonable jury could credit in Appellant Holloway's favor. Known conduct treated as non-terminable but later used to justify termination after protected activity or an alleged policy violation that the employer's own records do not tie to Mr. Holloway in which Mr. Holloway states are false, all combined with the satisfaction of a prima facie case. The district court resolved these disputes instead of leaving them to a jury and for that reason there is reversible error. I will address my argument in three parts. One, does McDonnell Douglas v. Green control this case? Two, if McDonnell Douglas v. Green controls the case, did the district court err in its application of the same? And three, did the district court err when it found that there was no genuine issue of fact regarding the Appellant Holloway's state law whistleblower claim? First, does McDonnell Douglas v. Green control this case? The continued viability of the burden shifting mechanism of McDonnell Douglas v. Green for purposes of summary judgment is in flux. But we are an inferior court and while Justice Thomas has written eloquently on the issues with this and a number of judges including at least one member of this panel has said that it should be looked at, that we are an inferior court and we have to follow our rule of orderliness and Supreme Court precedent. How can this argument be, are we the wrong court for you to make this argument to? I do not think so Judge and let me answer that question because Justice Thomas answered the question in the Ames decision. In Ames v. Ohio Department of Youth Services, he stated in his concurrence, quote, the Supreme Court has never considered much less held that McDonnell Douglas framework is an appropriate tool for summary judgment purposes. He went on and said and he had hinted at that in his dissent in the Hiddle v. City of Stockton case, but he went on in Ames and said, quote, litigants in lower courts are free to proceed without the McDonnell Douglas framework because the Supreme Court has never required anyone to use it. So if we're assuming arguendo that we are not, that we are free to proceed, we're not free to proceed under our own rule of orderliness are we? A legitimate concern and in that concern I believe that this court, first of all you have to start somewhere, okay? Alright? And I think in your dissenter concurrence in the awe decision, you stated that you joined the resounding chorus that it's not appropriate for summary judgment purposes, but you felt bound by the decision. So I think the court has to treat it similar to the way the court treated the improper doctrine of ultimate employment decisions in the Hamilton v. Dallas County case where it has to go en banc, but it has to start somewhere. And Justice Gorsuch and Justice Thomas have said that you have as a lower court the authority to take away or to do away with this jurisprudential task that is in conflict with the statute, in conflict with the text of Title VII, but do you have to go through your process of orderliness? Yes, I think you do. But we have to start somewhere. So you anticipate that we might adhere to our rule of orderliness, but you're hoping that perhaps you can get a bigger group of our judges to want to look at this issue. Is that where we are? I think it is, Your Honor. I think that whenever a person makes a mistake, that the person has to conduct reflection and insight and learn from that mistake. Courts are made up of human beings. I think that the court has to conduct reflection and insight. This is I think that McDonnell Douglas was a burden-shifting mechanism that was created for bench trials. It was never intended to be applied to jury trials. It was grafted on, and I love the language that Judge Costa used in his opinion where he said, it grew like kudzu. And it's grafted on to other areas of the law. But I do believe that the simple answer is if this court follows Justice Thomas' guidance and says the lower courts have the authority to do it, if this court looks at the text of Title VII only, McDonnell Douglas should not be applied at the summary judgment stage. And Justice Gorsuch and Justice Thomas have instructed that the court is free to ignore that jurisprudential test. Assuming that our panel needs to deal with whether or not there was an error in the application of McDonnell Douglas here, did your client overcome pretext? That would be my second argument. Can you move to that? Absolutely, and that's where I was going. Even if McDonnell Douglas controls, the district court still erred. It's unfortunate that the Supreme Court's statements have left circuit courts and district courts in limbo. At the same time, however, the Supreme Court has repeatedly admonished that McDonnell Douglas' mechanism was, quote, never intended to be rigid, mechanized, or ritualistic. And the courts have repeatedly admonished lower courts that summary judgments should be viewed in light most favorable to the non-moving party, flawed as McDonnell Douglas is. That burden shifting scheme is fundamentally unjust when there's deviations from those hard rail admonishments. And that's where the district court failed in this case. Following the district court's proper finding that Appellate Holloway had satisfied his promiphasia case, the district court found that the defendant appellate met its burden of production. But the crux of this case is what constitutes sufficient evidence to establish a plaintiff's burden at the persuasion level at a pretext stage. And it's particularly difficult in cases where you don't have direct evidence. And the Supreme Court has said, I believe, in the Thorne-Thurston case, that direct evidence you don't consider McDonnell Douglas at all. So this is a case of combined circumstantial evidence, one of the most difficult ones for courts to deal with. Here, the district court erred when it failed to consider the declaration of Mr. Holloway for purposes of pretext, stating that the same was self-serving, and that Mr. Holloway had failed to, quote, provide other witness statements or other record evidence. But while we disagree that he had failed to provide that evidence, at the outset, the Fifth Circuit has never found that a self-serving declaration can't create a genuine issue of fact. And that's the government. Haven't we said to the contrary? In fact, it can create, because most declarations are self-serving, and that's not a flaw. It's whether or not it's just speculative or based upon personal experience or something. That's correct, Your Honor. And that's the Guzman v. Allstate Assurance Company case that we cited in the brief. The Fifth Circuit has been very clear that self-serving evidence alone may not be discounted on that basis. How much weight or credit the self-interest evidence is to be given is a question of credibility. But that's for a jury, not for a judge. So what is the evidence that overcomes the pretext here, specifically? Here Mr. Holloway presented a combined evidence case of pretext. He had the close timing of retaliation within one month from his alleged protected activity. The records attached by the defendant indicate that at least one of the reasons for the termination, the improper credit card use, was not considered until after his protected activity. And if you look at the report that was given, that particular report I believe is in the record at 180-181. That was before the termination, days before the termination, right around the protected activity. Their own report didn't indicate that termination was going to be the result of the use of credit cards. So with respect to that, you have conduct that he did violate a policy, but the question is not did he violate the policy, but was the violation of policy used as a way to discriminate against and or retaliate against. And the two are not mutually exclusive. You had that combined with the appellant's declaration that the procurement policy he followed and that the statements that he did not were false. And the only real evidence that they attached was the audit report of November 18th of 2022, and that's at record 188-189. But if you look at that report, it never mentions Mr. Holloway by name. And in fact, the person to whom they attribute the conduct was a person who had disciplinary action in 2019, and everybody in this record agrees that the only disciplinary action that Mr. Holloway had previously had was in 2020. So the issue in this case, really at this stage of McDonnell-Douglas, if we apply it, is what constitutes substantial evidence to establish pretext when the court is presented with a combined circumstantial evidence case. And this is where I think Judge Dennis left us perhaps his most, not his most thoughtful, because he had a lot of guidance to give this court. But one of the guidance that would be important in this case before taking an inactive status, and that's the plaintiff must produce substantial evidence at trial to actually rebut a defendant's legitimate business reason. But in the summary judgment context, substantial evidence is that evidence which is enough to support a reasonable inference that the proffered reason is false. Here that substantial evidence exists. You have timing. You have contradictory information in their own documents as it relates to the proffered reason. You have an audit report that doesn't even reference Mr. Holloway. I'm going to stop you right there. On the audit report, doesn't it say name of subject Brandon Holloway? It does, but if you look at the particular audit report, other than saying that, it says in the disciplinary comment, it says it references an employee that has disciplinary action in 2019, and Mr. Holloway did not have disciplinary action in 2019. It was 2020. Yes, yes ma'am. Here, we believe that when he was disciplined... So you think the audit report is not about him, and it's not just a typo, or we don't know? We don't know. I mean, and that's the problem with McDonnell-Douglas, is the defendant has a duty to produce, but the plaintiff has a duty to persuade. And we think with all of the evidence that we've presented, that substantial evidence exists that a reasonable juror could conclude and make a reasonable inference that discrimination and or retaliation occurred. You know, though, they don't want us to get... They don't want us to... The traditional thought is that we're not supposed to micromanage what would be actionable conduct to terminate somebody. You know, that's up to the employer. So if they say, well, not following the protocol on this is bad enough to get... They don't want us to micromanage that and say, well, we think you should have suspended him for a week, or given him a talking to, or a letter in their file instead, or something. You're not asking us to do that, are you, Ms. Jones? No, no, I'm not. To say that the punishment is not right, or something. I'm asking you to consider the evidence in its context, that prior to engaging in protected activity, this is a 16-year employee who had one policy violation on the credit card that the company determined was not terminable, but it became terminable after he engaged in protected activity. So they had already decided that it wasn't terminable, so that's what the pretext is. That's the combination of the timing and the decision. If you look at their investigatory report, their investigatory report on the November 18th of 2022, which does not recommend termination. It simply says that he needs to go to a policy refresher class, and they recommend demoting him to shift work, and taking him out of this position, but it doesn't recommend termination. But then he's terminated within three weeks, on December 6th of 2022, and this is one of the reasons that... So what happened in that three weeks, other than the protected activity? Well, did they have some meetings with him? The protected activity were the meetings that he had with Will Morgan, the meetings that he had where he was complaining about discrimination, and he was complaining about whistleblower violations. Let's talk about the chronology. The credit card abuse was in August, or I think he conceded he'd improperly used it. The credit card incident was in August. They talked to him in September, I believe September 7th, and while that investigation was going on, on November 18th, that's when the policy violation was alleged to have occurred, and then they completed the final report regarding the credit card issue on November 30th. So wasn't there an intervening allegation of conduct between the credit card incident and the ultimate termination? I think that... Let me state as I understand the facts, and I went through the records yesterday myself. On August 25th of 2022, the credit card issue became a reportable incident because when it was brought to his attention, he brought it to his supervisor's attention and said he misunderstood the policy and thought if you paid it back. So that was in August. Then in September, he engages in protected activity. At this time, he's told by his supervisor that he's not going to be terminated, that possibly there would be disciplinary counseling, but he had not been in disciplinary counseling at this point. Then on November 30th, that's the investigatory report at ROA 180 to 181, and that's the report only with respect to the credit card issue. It does not mention termination. It mentions only that he's going to be moved to a shift and there will be a policy refresher course. I see that I'm out of time, but I'd like to answer your question. Well, may I? Yes, please. This is, I think, significant. Are you contending that the credit card abuse was the only reason he was fired? No. No, Your Honor. They state in the termination letter that it's the credit card issue and policy violations regarding safe procurement. The policy violation that was alleged to have occurred after the credit card statement, but before the report regarding the credit card statement. Well, they don't state when that policy violation occurred, but the only information we have regarding safe procurement policy violations is the audit report, which is at 188 and 189, which is dated November 18th of 2022. So, he did or didn't violate the safe procurement? His testimony is that he did not violate, and that's what he included in his declaration. And if you look at this particular report, it's a little vague as to whether it's referencing him. It does state his name, but then it has information regarding other information that isn't consistent with him. So, you have a genuine issue of fact on this particular issue if you look at his declaration, the timing of the event, the satisfaction of the prima facie case. Of whether he actually violated the safe procurement policy, or whether that was used to... As a protection. ...to end up a termination. That's correct, Your Honor. Out of something they'd already determined wouldn't be a termination. That's correct. That's your theory. Okay, good. Thank you. I think we have your argument. I'm sorry for going over on time. I did reserve five minutes for rebuttal. You have five minutes for rebuttal. All right. Okay. Mr. Taylor, let's hear from you, sir. Thank you, Your Honors. Good morning, and thank you for seeing me. Of course. May it please the Court, my name is Michael Taylor, and I represent the Procter & Gamble Manufacturing Company. I'd be remiss if I didn't skip over the problems with McDonnell Douglas here, but just briefly, this is not the right case to abandon McDonnell Douglas. I think I'm stating the obvious, but just to perfect the record, appellant didn't cite any authority giving this Court, or any Fifth Circuit Court, the ability to disregard McDonnell Douglas, and for that reason, the Court did not abuse its discretion in using McDonnell Douglas. I'd also be remiss if I didn't say that this is not... Are you saying the En Banc Court couldn't revisit this issue? Yes, the En Banc Court could, but it had not. It had not before Judge Drell used McDonnell Douglas in that regard. So Judge Drell used our precedent. Exactly. But I don't think your friend on the other side is saying to the contrary. She may say he didn't apply it correctly, but she's saying he did use our precedent, but the issue is whether our precedent is wrong under the text of the statute. Right, and in that regard, the precedent is not wrong. There is a process to getting to the point of these things, and that leads me to my next point, Your Honor. This is more of a case where the lack of discovery creates the problems in the McDonnell Douglas framework. What we're using here are recollections that aren't necessarily personal. You're using recollections based on innuendo, conjecture, for lack of a better term, getting information from third and maybe fourth hand sources about how someone may have been discriminated against. I'm sorry, where does that take us? Lack of discovery creates problems with the McDonnell Douglas framework. That seems to cut in favor of the McDonnell Douglas framework is not the right framework. That didn't seem to bolster the, give us confidence in the decision, does it? So I'm trying to figure out where you're going with that that would be helpful to you. Well, it is helpful because in each case that you see here, when we're talking about the plaintiff's burden to establish substantial record evidence in order to create a fact question regarding pretext, you have to go beyond what the person actually said. And specifically here, he's saying that there are several other people who were treated differently and who were not disciplined like he was, but he doesn't have any substantial evidence. He doesn't have any first hand evidence on why that took place, when that took place and who made those types of decisions that would make his separation discriminatory. Do you have evidence that several people were not treated differently about the credit card or procurement? No, Your Honor, but it's not our burden to produce that. It's the plaintiff's burden. Well, if that's your basis, do you, did you follow your policy and you terminated someone for this, then you would say that's our policy and we do this. Exactly. But you have any evidence to support that? No, Your Honor, we did not. And that's what the whole problem here and why she believes McDonnell Douglas wasn't followed correctly, because it's their burden. When a plaintiff brings this type of action, it's their responsibility to create the inference. They have the burden of persuasion here. We only have the burden of production. So in essence, when we list out the legitimate non-discriminatory reasons for the separation, it's the plaintiff's burden to say, no, there's other information that makes this, that makes these reasons not credible or not worthy of credence. And he's only relying on his personal recollections, recollections that don't have anything to do with any of the investigations or any of the other circumstances to which he is alleging to. Is it true that your client said, we're not terminating you for this credit card situation? No, it is true that he said that they're terminating him for the credit card situation. No, that y'all gave him assurances that he would not be terminated for, that the supervisor said you're not going to be terminated for the credit card situation. Is there some evidence in the record that says that? No, there isn't, Your Honor. There's no evidence that the supervisor ever said you're not going to be terminated for this? That's correct, Your Honor. It's his recollection of it. Well, that's some evidence that the supervisor, this person, told me that I would not be terminated for that. That's some evidence. Yes, that might be some evidence, but that's not the substantial record evidence that is required to create a genuine fact question regarding pretext. Was he told, does he, according to his own declaration, say he was told that at the meeting in September? That I don't have a specific recollection, Your Honor. Page 280, paragraph 9 of his declaration. In his declaration, it says, while it is true that in July, many months before the termination of my employment, I used a credit card to pay for two personal items. And he goes on to say, while these issues were brought to my attention in September 22, I was notified by Defendant's Human Resource Matter, Kevin Hood, for the first time that my understanding of the policy was correct. However, I was also told that I have paid all charges. It was not currently in any disciplinary counseling. Termination of my employment was not warranted due to Defendant's progressive discipline policy. That was in September of 22. Was there a subsequent report of a violation of policy? Yes, there was. And that had to do with the safe violations that we had alluded to earlier. And that reflected a pattern of practice of not following policy because he had also been disciplined for that same type of violation in 2020. So with that said, when you look at the termination letter that was provided in December of 2022, it listed not only the credit card violation, but also the policy violations. So he may have genuinely believed in September of 22 with this conversation with Kevin Hood that he wasn't in danger of being separated, but subsequent actions changed that. Is there some fact in the record that he violated procurement policies in the time period between September and November? And what was the nature of that violation? My understanding of the record, Your Honor, is that the investigation that resulted in the November 2022 report happened prior to that report being given and prior to the September interaction with the credit card violation. So it would be incorrect to say that he violated procurement policies for a second time shortly before his termination. That's not correct. It's not completely accurate. I'm not going to say that it's incorrect because the actual date of that second policy violation happened sometime between August of 2022 and November of 2022. But we don't know when he did this or what the violation was. Well, we do want to know what the violation was in that he bypassed company policy in contacting suppliers, I mean vendors, in trying to get prices for the products that were being sold. But as far as the report is concerned, it didn't specify the exact date as to when that occurred. Does it even specify a month or a year in which that occurred? Unfortunately, Your Honor, it does not. What about the key findings in the global internal audit at 188 where it gives the specific dates where he signed off on invoices without checking them? One says October 10, 22. One says October 29, 22. One says September 6, 22. One says September 7, 22. September 8, 22. July 18. July 27. So is November 18 the day that they completed the investigation regarding this conduct that had started at the same time or at least around the same time or maybe even before the credit card incident? Yes, Your Honor, that's accurate. And that's a different policy violation, for lack of a better term, than the bypassing company protocol and getting a vendor invoice. So he also did that? That's correct. And that's in the record and the basis for him being terminated? That's correct, Your Honor. Okay, say that again. Are those the right dates? He did those things on those dates? And what is it exactly that he did? Yes, Your Honor, there were outages, inconsistencies in the reports that he was supposed to maintain for the gate receipts, for lack of a better term. And it was found that he had several violations where vendors were not charged correctly for picking up things and delivering them outside of the plant. My point is that these violations are separate and distinct from the procurement violations. And after obtaining that report, it became apparent that the policy violations that he had generated beginning in 2020 were not abated. And this was also in conjunction with the credit card violations that happened in July of 2022, and that what he was counseled with in September of 2022. What about Ms. Jones' argument that this thing isn't even about him, and that they've got the wrong person? Well, what I would say to that- And that this document doesn't even relate to him, and his name's just been tacked on the record. He's not even the violator in these incidents. What I would say is that Ms. Jones, or at least Mr. Holloway, is conflating what might be unfair with what is illegal, because these violations didn't have anything to do with any protected class or any protected activity. He simply disagreed with what the company had determined regarding the procurement issue and the outages that caused him to be removed from signing off on the waste manifest. Right. But did the contemporaneous document show that he did these things, or is it somebody else who did these things? No. There's no other person that had the responsibility for maintaining those gate receipts, and that he was solely responsible for doing that. Because he insisted on continuing to sign the paperwork. That's correct. Yes, he insisted on continuing to sign that paperwork, even though he had been removed from his position based on the gate receipt violations that were apparent in the GIA report. Right. So that's why I indicated that he's conflating what might be termed as illegal activity based on what he believes is protected activity and putting under the microscope the company's legitimate business decisions to remove him from his post based on the information that it had. Was he the only business environmental contact for the company at this location? No, he was not. He was not. Do you have anything further? Let me make sure I have my notes here to make sure that I completed everything that I have. But when it really comes down to it, Your Honor, what this really boils down to is there isn't substantial record evidence regarding pretext to create a back question for a jury. You're only relying on information that only suggests that he disagreed with the company's decision and not that any employment decision was based on any protected class or any protected terrorist heuristics or any protected activity. So with that, Your Honor, I will yield. Thank you. We have your argument. Ms. Jones, you've saved time for rebuttal. Your Honor, Mr. Taylor stated that Mr. Holloway had not cited any authority for overturning the precedent of McDonnell Douglas, but we did cite authority. We cited the Ames decision concurrence of Justice Gorsuch and Justice Thomas. We also indicated that in the Awe decision, Judge Elrod, I think you joined the resounding chorus. And then, of course, the mere fact that do you really need precedent if it conflicts with the statute? We do agree, however, that in order for the lower court, which Justice Thomas has encouraged the lower court to consider this issue, that you may have to deal with your rule of orderliness and you may have to go en banc on that issue, similar to the way the ultimate employment decision issue previously performed a patient case was dealt with in the Hamilton versus Dallas County case. With respect to the pretext issue, I think this is where timing gets really critical. And Judge Ramirez, I think you hit the nail on the head with respect to the timing. Before we get to the pretext, you skipped to the pretext. Does that mean you're conceding that the apoly met its burden with regard to what was required to establish its non-discriminatory business reason? If you look at Rule 56A, and we argued this in the brief, that when you produce the discriminatory business reason, you have to produce some evidence. And we attacked the declarations as not being some evidence. And then we attacked all of the documentary evidence as not being competent evidence. Now, for summary judgment stage, it has to be only capable of being admissible at trial. And so with respect to authentication, respect to those issues, I think that with respect to that, it should be, it is evidence. It's some evidence. Or it could be some evidence. The problem here is they've attached documents that we don't know where they exactly go with respect to their legitimate business reason, which is why I included that in the brief. Because I think it's very weak at the Rule 56A stage. But you didn't object to the admissibility of the documents that they submitted in support of their reason at the district court? Your Honor, I did not. And the reason I didn't is because I've done it a thousand times. And every time I do it, I get met with the rule. But it just has to be admissible at trial. So why isn't that argument forfeited here? It may be, which is why I didn't include it in my argument earlier. But I think then you go straight to pretext. Okay. Thank you. And that's where I think you did hit the nail on the head with respect to the timing. It's very clear that this 16-year employee hadn't had very many issues with respect to disciplinary issues up until the point in time that he refused to engage in what he thought was a violation of state law. And he made a complaint of race discrimination. And then all of a sudden, in the months of September, October, November, and December, he comes under closer scrutiny. If you look at the audit report, it's dated November 18th of 2022. After he made, he engaged in protected activity. It does not recommend termination. If you look at the credit card issue, the credit card issue is dated November 30th, that investigatory report. It does not recommend termination. So the timing in this case is, then, is there sufficient evidence to show that the credit card issue alone is not enough to justify termination and that the audit report is not enough to justify termination? When the plaintiff appellant has come forward with evidence showing he met his prima facie case, that the allegations with respect to the credit card are suspect because the terminal action didn't become, it didn't become a terminable action until after he engaged in his protected activity. And with respect to the audit report, he denies the allegations against him. And he believes that the same, that this audit report doesn't tie it to him. It's also critical to note that his state law violation claims on whistleblower, where he was complaining that other people were signing reports of his when they weren't actually doing the review. And then in this audit report, all of a sudden, he gets blamed for that. So it all happened within the span of months. We believe that with the prima facie case, combined with that timing, combined with the statement of Mr. Holloway in his declaration, combined with his deposition testimony, all of this suspect evidence that they produced, we believe that substantial evidence exists such that pretext should be an issue that should be allowed to go to the jury. So he didn't sign the things that have his name on them that were waving people through or whatever other people did? Anything that he signed, he signed. But my point here is that with respect, and I'm out of time, but can I answer your question? Yes, please. Okay. That with respect to his whistleblower claim, one of his complaints was that they were falsifying documents, that he was the one loading the inventory and Bridget Anders was the one signing the document when she never saw what was loaded. And coincidentally enough, the only two declarations we have are from Will Morgan, the person to whom he engaged in protected activity with, and Bridget Anders, the person against whom he was making the complaint. So all of the evidence is suspect in this case, and we believe that substantial evidence exists with respect to pretext and that this case should be remanded and summary judgment should be reversed. Thank you. We appreciate your argument and your argument too, Mr. Taylor. And so the case...